UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KIMBERLY R. PERKINS,

                    Plaintiff,

   -against-

UNITED STATES DEPARTMENT OF THE
TREASURY; UNITED STATES BUREAU OF THE
MINT; JANET YELLEN, SECRETARY OF THE
UNITED STATES DEPARTMENT OF THE
TREASURY,

                    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 01/03/2022

No. 18-cv-08911 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

      Plaintiff Kimberly R. Perkins ("Plaintiff") brings this action against Defendants United States Department of the Treasury (the "Treasury"), United States Bureau of the Mint (the "Mint"), and Janet Yellen[1], Secretary of the United States Department of the Treasury (collectively, "Defendants"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq*., and a common law claim for wrongful termination.  Before this court is Defendants' motion for summary judgment. (ECF No. 87.)  For the foregoing reasons, Defendants' motion is GRANTED.

---

[1] Under Federal Rule of Civil Procedure Rule 25(d), Janet Yellen, Secretary of the United States Department of the Treasury, is automatically substituted in place of former Secretary Steven T. Mnuchin.

# BACKGROUND

The following facts are derived from the record and the parties' Rule 56.1 statements. They are not in dispute unless otherwise noted.

Plaintiff is an African American woman born in 1966. (Counter-Statement of Material Undisputed Facts Pursuant to Local Civil Rule 56.1 ("56.1") ECF No. 97, ¶ 1; Declaration of Marshall B. Bellovin, Esq. ("Bellovin Decl.") ECF No. 96, Ex. 6 ¶ 3.) She began working at the Mint in 1987 as a coin checker. (*Id*.) In approximately 2009 or 2010, Plaintiff became an Internal Control Supply Clerk at the Mint. (*Id*. ¶ 2.) In approximately 2014 or 2015, Plaintiff was diagnosed with a stress and anxiety disorder. (*Id*. ¶ 7.)

## I.   Issues with Supervisors

From March of 2013 through September of 2013, Debra Satkowski was Plaintiff's first-line supervisor. (*Id*. ¶ 3.) On September 23, 2013, Plaintiff informed Supervisory Inventory Management Specialist Karen Lawless that Satkowski was talking about her to other employees. (*Id*. ¶ 9; Declaration of Karen Lawless ("Lawless Decl.") ECF No. 94, ¶ 1.) A few days later, Lawless asked Plaintiff if she wanted to discuss her concerns with the Equal Employment Opportunity ("EEO") manager, but Plaintiff declined. (56.1 ¶ 10.) On September 30, 2013, Plaintiff met with the Deputy Plant Manager Tom DiNardi, Satkowski, and Lawless, and after the meeting DiNardi moved Satkowski to the second shift, which Plaintiff did not work. (*Id*. ¶¶ 11-12.) From September of 2013 through November of 2013, Lawless was Plaintiff's first-line supervisor. (*Id*. ¶ 4.) DiNardi conducted a management inquiry which found that Satkowski did discuss Plaintiff with other employees, and Satkowski was disciplined. (*Id*. ¶ 12.)

On February 27, 2014, Plaintiff initiated an informal EEO complaint alleging violations of the ADEA, Rehabilitation Act, and Title VII. (Declaration of Natasha W. Teleanu ("Teleanu

Decl.") ECF No. 93, Ex. O.)  Beginning in December of 2014, Plaintiff repeatedly requested to be moved to a different department at the Mint.  First on December 17, 2014, Plaintiff requested a detail to another department until her EEO case was complete.  (Declaration of Tom DiNardi ("DiNardi Decl.") ECF No. 90, Ex. A.)  She alleged that she was continuing to have issues with Satkowski, and that Lawless would take Satkowski's side regarding their disputes.  (*Id*.)  DiNardi met with Plaintiff the same day and explained that the Mint could not detail her to a different department because they required support in her current position.  (*Id*. Ex. B.)

On January 6, 2015, Plaintiff delivered a doctor's note to Lawless that stated, "Patient tells of often being sad in her current position and would benefit if she was detailed/transferred to another department."  (56.1 ¶ 29.)  Lawless reported this to DiNardi, who stated he already addressed it.  (Lawless Decl. Ex. L.)

On March 16, 2015, Plaintiff again requested to be removed from her department.  (56.1 ¶ 30; Lawless Decl. Ex. M.)  She stated the supervisors did not value the employees, and reported disagreements with her supervisor Shirley Kemp.  (Lawless Decl. Ex. M.)  On August 28, 2015, Plaintiff requested to be reassigned to a new department, which was reported to Kemp and Lawless.  (56.1 ¶ 31; Lawless Decl. Ex. N.)  Lawless stated there were no positions for her to be transferred to.  (*Id*.)

On January 4, 2016, Plaintiff received a letter of reprimand from Kemp based on five issues: (i) refusal to meet with her supervisor; (ii) leaving her work area without proper authority; (iii) an unauthorized absence; (iv) failure to follow proper procedure; and (v) inappropriate conduct.  (56.1 ¶ 51; Teleanu Decl. Ex. M.)

On March 9, 2016, Plaintiff asked again for a detail.  (56.1 ¶ 32; Lawless Decl. Ex. O.) Plaintiff requested either a detail to pressing 24-k 1/10 dimes or shipping as a supply clerk.  (*Id*.)

In response, Lawless provided her with a reasonable accommodation form, and instructed her to fill it out with new medical documentation that stated what she can and cannot do physically. (56.1 ¶ 32; Lawless Decl. Ex. P.) Plaintiff stated her doctor had already written three notes. (Lawless Decl. Ex. P.) Lawless responded that because those notes stated that Plaintiff is able to return to her normal duties, the Mint required a new note documenting the medical need for a detail as a reasonable accommodation. (*Id.*) Plaintiff stated this did not make sense as shipping was already part of her duties. (*Id.*) Lawless responded that Plaintiff is requesting to be detailed to do only one part of her job for an extended period of time, which is a reasonable accommodation due to Plaintiff's stress, and therefore the reasonable accommodation form and medical documentation were needed. (*Id.*) Plaintiff again stated this did not make sense to her. (*Id.*)

On March 14, 2016, Plaintiff met with Lawless and others regarding her requests for a detail. (56.1 ¶ 33; Lawless Decl. Ex. Q.) Lawless informed her that she had previously mixed-up requests for a reasonable accommodation and a request for a detail. (Lawless Decl. Ex. Q.) As shipping was already part of Plaintiff's current job, her request to work for that department was denied. (56.1 ¶ 33; Lawless Decl. Ex. Q.) Lawless reminded Plaintiff that if she wanted a detail in pressing, she would need to provide medical documentation stating she could run a press. (*Id.*)

On July 15, 2016, Plaintiff submitted the request for a reasonable accommodation form. (56.1 ¶ 35; Lawless Decl. Ex. R.) Plaintiff requested to be transferred to a different department as a reasonable accommodation due to "stress, not eating, not sleep well, anxiety, fearfulness working under Shirley Kemp and Karen Lawless." (*Id.*) She attached two doctors' notes dated January 6, 2016 and July 9, 2016, requesting and recommending she be moved from her department. (Lawless Decl. Ex. R.) On October 16, 2016, Lawless responded to Plaintiff's request by stating:

> In response to your request, and based on the information I have received, I am unable to determine if this request falls under the requirements for a reasonable

accommodation. Specifically, the medical documentation you provided is insufficient to allow the Agency to determine whether you have a qualifying disability under the ADAAA. If you would like to resubmit medical documentation, you can work with [the EEO Specialist] to determine what information is necessary.

(56.1 ¶ 36; Lawless Decl. Ex. S.) Lawless also offered Plaintiff three options outside of the reasonable accommodation process including (i) transfer to a different shift with a different shift supervisor; (2) first consideration for a Metal Forming Machine Operator position when one became available; or (3) a combination of options (1) and (2). (56.1 ¶ 37; Lawless Decl. Ex. S.) In response, Plaintiff stated the second and third shift supervisor, Satkowski, was the reason for her first EEO case, and she detailed a neck injury she received after a car accident. (Lawless Decl. Ex. S.) NiDardi then informed Plaintiff that there were two other positions at the Mint that she could apply for. (56.1 ¶ 37; Lawless Decl. Ex. S.)

On August 21, 2016, Kemp issued a notice of a proposed seven-day suspension for Plaintiff based on nine charges related to Plaintiff's repeated refusal to meet with Kemp, failure to follow protocol and instructions, and disrespectful comments. (56.1 ¶ 52; Lawless Ex. X.) Several of the charges were upheld, and Plaintiff was suspended for seven days from September 11, 2016 through September 17, 2016. (56.1 ¶ 53.)

## II.  *Requested Sick and Medical Leave*

The 7th National Agreement between the Mint and the Mint Council, American Federation of Government Employees (the "National Agreement"), states that approval of sick leave is granted to an employee when he or she "[r]eceives medical, dental, or optical examination or treatment"; or "[i]s incapacitated for the performance of his or her duties by physical or mental illness, injury, pregnancy, or childbirth." (*Id*. ¶ 15; Lawless Decl. Ex. B.) Further, Mint Directive MD 8003.14 (the "Leave Directive") states that employees must either request sick leave in

advance or no later than two hours from the start of the workday or shift for unscheduled illnesses. (Lawless Decl. Ex. A.)  Sick leave exceeding three workdays requires medical documentation to support the absence once the employee has returned.  (*Id*.)

Mint Directive MD 8003.04 (the "Medical Directive") requires employees returning from medical leave to provide written medical documentation from his or her physician certifying the employee is able to return to full duty or submit to an examination by a Mint physician.  (56.1 ¶ 43; Teleanu Decl. Ex. I.)  Mint security is always informed of employees returning to work who need medical clearance, and they are instructed to contact human resources or a supervisor when they return.  (56.1 ¶ 44.)

On January 28, 2014, the human resources point of contact for Family Medical Leave Act ("FMLA") requests, Carol Helbig, denied Plaintiff's request for FMLA leave.  (*Id*. ¶¶ 25-26; Teleanu Decl. Ex. F.)  She informed plaintiff that additional information was needed to determine if her FMLA leave request could be approved.  (56.1 ¶ 26; Teleanu Decl. Ex. F.)  On February 7, 2014, Plaintiff requested and was granted sick leave for January 30, 2014 and January 31, 2014. (56.1 ¶ 16; Lawless Decl. Ex. C.)  On March 4, 2014, after providing additional information, human resources approved Plaintiff's request for FMLA leave.  (56.1 ¶¶ 27; 45; Teleanu Decl. Ex. G.)  In the notice approving the request, Plaintiff was notified that she would be required to present a "fitness-for-duty certificate" before being allowed back at work.  (56.1 ¶ 45; Teleanu Decl. Ex. G.)  This same day, the Mint's Security Office sent an email to "WP-Police Supervisors" stating Plaintiff would not be allowed on the Mint property unless they first received a notification from human resources, and if Plaintiff entered the premises they were to hold her and contact human resources.  (56.1 ¶ 46; Teleanu Decl. Ex L.)

6

On July 21, 2014, Plaintiff requested to take sick leave for July 17, 2014 and July 18, 2014, but Lawless denied this request, stating she did not meet the National Agreement's requirements for leave approval.  (56.1 ¶ 17; Lawless Decl. Ex. D.)  Plaintiff was noted as Absence Without Leave ("AWOL") for 7.15 hours on July 17, 2014 and 8 hours on July 18, 2014.  (56.1 ¶ 17.)  AWOL is defined as "[a]n unauthorized absence," and an AWOL employee receives no pay for such an absence.  (*Id*. ¶ 13.)  Plaintiff requested and was granted sick leave on July 23, 2014, July 24, 2014, and July 25, 2014.  (*Id*. ¶ 19; Lawless Decl. Ex. E.)

On August 2, 2016, Plaintiff requested and was approved to take four hours of sick leave and four hours of annual leave on August 1, 2016.  (56.1 ¶ 21; Lawless Decl. Exs. G & H.)  On August 10, 2016, Plaintiff reported to work but had to leave after approximately ten minutes.  (56.1 ¶ 22.)  She was charged with 8 hours of AWOL.  (*Id*.; Lawless Decl. Ex. I.)  The next day, Plaintiff reported to work and again stated she had to leave.  (56.1 ¶ 23.)  She told Lawless she was sick and needed to leave, but Lawless denied this request.  (*Id*.)  Plaintiff left anyway and was charged with 6 hours of AWOL.  (*Id*.; Lawless Decl. Ex. I.)

On October 19, 2016, Plaintiff was issued a notice of proposed fourteen-day suspension based on four charges related to AWOL, failure to follow instruction, and disrespectful conduct.  (56.1 ¶ 54; Lawless Decl. Ex. J.)  On November 4, 2016, Lawless met with Plaintiff to discuss the fourteen-day suspension.  (56.1 ¶ 24.)  After the meeting, Plaintiff left work without following leave procedures and was charged with one hour of AWOL.  (*Id*.; Lawless Decl. Ex. K.)  Plaintiff was suspended for fourteen days, from November 6, 2016 through November 19, 2016.  (56.1 ¶ 55.)

   *III.    Mint Audit*

After the Mint completed its annual audit in 2014, members of the count teams that participated received monetary awards.  (*Id*. ¶ 47.)  Plaintiff was not a formal member of the audit team but did volunteer to assist with photocopies of audit papers.  (*Id*. ¶ 48.)  Plaintiff did not receive the bonus.  (*Id*.)

IV.    *Mint Retirement Class*

On March 27, 2015, Plaintiff inquired about how employees were selected to attend a retirement class.  (*Id*. ¶ 40.)  On April 2, 2015, Lawless met with Plaintiff and explained the retirement class had only 20 spots and people were invited based on their scheduled retirement date, which is based on age and time in service.  (*Id*. ¶ 41; Lawless Decl. Ex. T.)  On July 12, 2016, Plaintiff stated she would not be attending the retirement class, and instead requested a one-on-one meeting with the retirement contractor, which was scheduled for July 13, 2016.  (56.1 ¶ 42; Lawless Decl. Ex. U.)

V.    *Plaintiff's EEO Complaints*

On April 21, 2014, Plaintiff filed a formal EEO complaint.  (Teleanu Decl. Ex. O.)  On March 3, 2015, the initial EEO investigation into Plaintiff's complaint was completed, and on August 7, 2015 a supplemental investigation was requested.  (*Id*.)  On December 28, 2015, the Treasury issued its Final Agency Decision regarding Plaintiff's EEO case.  (*Id*.)  Plaintiff alleged violations of the ADEA, Rehabilitation Act, and Title VII based on Satkowski's statements about her, being placed on AWOL and the denial of FMLA, the alert to security regarding her return to work, not receiving the audit bonus, her lowered performance appraisal, and denial of reasonable accommodations.  (*Id*.)  The Final Agency Decision found that a finding of no discrimination was appropriate, and Plaintiff was not entitled to relief.  (*Id*.)

On January 29, 2016, Plaintiff appealed the Treasury's Final Agency Decision to the EEOC.  (Teleanu Decl. Ex. P.)  While the appeal was pending, Plaintiff filed four additional formal EEO complaints.  (Teleanu Decl. Exs. Q; R; S; T.)  On June 29, 2018, the EEOC completed its review of the entire record, and affirmed the Treasury's final decision as "the preponderance of the evidence of record does not establish that discrimination occurred."  (Teleanu Decl. Ex. P.)

## VI.    Plaintiff's Termination

Plaintiff initiated this action on September 28, 2018.  (ECF No. 1.)  Plaintiff continued working at the Mint.  On July 23, 2019, Plaintiff's supervisor, Amy Bennett, instructed Plaintiff to work at her assigned workstation.  (Declaration of Amy Bennett ("Bennett Decl.") ECF No. 92, 56.1 ¶ 6.)  The next day, Bennett observed Plaintiff working at another employee's desk.  (Bennett Decl. Ex. A.)  Bennett reiterated her instruction that she sit at her assigned workstation.  (*Id*.)  Plaintiff stated she would not return to her workstation.  (*Id*.)  The next day, Bennett emailed Plaintiff directing her to sit at her assigned workstation and sent a similar reminder a few days later.  (*Id*.)  On July 31, 2019, Bennett observed Plaintiff working outside of the workstation with a program ledger.  (*Id*.)  On August 5, 2019, Bennett issued Plaintiff a Notice of Proposed Removal based on her failure to comply with her instructions on July 24, 2019 and July 31, 2019.  (*Id*.)

On August 19, 2019, Plaintiff submitted a reasonable accommodation request from a doctor stating he was treating her for insomnia, anxiety, and depression, and her "interactions with Shirley Kemp, Tracy Henry, and Amy Bennett make[] it difficult for her to concentrate or maintain her train of thought."  (Teleanu Decl. Ex. H.)  He recommended that she not share an office space or work in a position where her back is facing someone.  (*Id*.; 56.1 ¶ 38.)  On September 5, 2019, Supervisory General Engineer Luigi DiCocco considered the Notice of Proposed Removal and

relevant documentation and affirmed the decision to remove Plaintiff from her position.  (56.1 ¶ 59; Teleanu Decl. Ex. N.)

After her termination, Plaintiff moved for leave to file an amended complaint, which she filed on October 17, 2019.  (ECF No. 48.)  On September 15, 2020, the Court granted Defendants' leave to file a motion for summary judgment (ECF No. 80), which they filed on January 27, 2021. (ECF No. 87.)

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, including depositions, documents, affidavits, or declarations "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  To oppose summary judgment, "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice.  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (holding the

nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (internal quotations and citations omitted)).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc*., 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013). Courts must "draw all rational inferences in the non-movant's favor" when reviewing the record. *Kirkland v. Cablevision Sys*., 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not [] to weigh the evidence and determine the truth of the matter" or determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id*. at 250. A court should grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## DISCUSSION

Defendants allege that Plaintiff has failed to (i) make out a *prima facie* case of race or gender discrimination under Title VII; (ii) demonstrate pretext for retaliation under Title VII; (iii) make out a disability discrimination claim based on failure to provide a reasonable accommodation; (iv) make out a disparate impact claim for disability discrimination; (v) make out a *prima facie* case of age discrimination; (vi) demonstrate a genuine dispute of material fact regarding her hostile work environment claim; (vii) plead a valid NYSHRL claim as the statute does not provide a remedy for federal employees; and (viii) plead a valid wrongful termination claim. The Court examines each of these arguments below.

## I.     Title VII

### a. Discrimination

Plaintiff brings a claim under Title VII for racial and gender discrimination based on disparate treatment.  (Am. Compl. ¶¶ 17; 96.)  Title VII provides that an employer cannot discriminate against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  Title VII disparate treatment claims are analyzed using the *McDonnell Douglas* burden-shifting framework.  *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).  First, the plaintiff must establish a *prima facie* case of discrimination by proving that (1) he or she is a member of a protected class; (2) he or she is qualified for the position held; (3) he or she suffered an adverse employment action; and (4) the adverse employment action "occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 498 (2d Cir. 2009).  While previously described as "minimal," the burden of showing a *prima facie* case is "a real requirement that can lead to dismissal if not met." *Carr v. Health Ins. Plan of Greater N. Y., Inc*., 111 F. Supp. 2d 403, 413 (S.D.N.Y. 2000).

Once the *prima facie* case has been shown, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.  If the employer is able to proffer such a reason, the burden then shifts back to the plaintiff "to show that [the defendant's] stated reason for [the adverse employment action] was in fact pretext." *Id*. at 804.

Here, Defendants allege that Plaintiff fails to establish a *prima facie* case of discrimination as she has failed to present any evidence of an inference of discrimination.  (Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Mem.") ECF No. 88, at 13-14.)  "An inference of discrimination can arise from circumstances including, but not limited to, 'the

employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse action].'" *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (citing *Leibowitz*, 584 F.3d at 502). Additionally, "a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group . . . is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Humphreys v. Cablevision Sys. Corp.*, 553 F. App'x 13, 14–15 (2d Cir. 2014) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). The similarly situated individuals must be "similarly situated in all material respects," including "having engaged in conduct similar to the plaintiff." *Blasi v. N.Y. City Bd. of Educ.*, Nos. 00-CV-5320 (RRM)(MDG), 03-CV-3836 (RRM)(MDG), 2012 WL 3307227, at *14 (E.D.N.Y. Mar. 12, 2012) (internal citations omitted).

Plaintiff avers she has alleged specific instances where she was treated unfairly compared to other similarly situated employees, specifically regarding (i) a bonus she did not receive; (ii) "unfair discipline"; and (iii) the denial of numerous requests for accommodations. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp.") ECF No. 95, at 9.) Plaintiff relies on sworn testimony from both Plaintiff and Evelyn Campbell, a Mint employee. (*Id.*) In addition, Plaintiff made additional claims of racial discrimination during her deposition. The Court will evaluate each separately below.

### i.  Bonus Awards

First, Plaintiff alleges she did not receive "a bonus award." (Opp. at 9.) The Amended Complaint includes allegations involving two bonuses, which Plaintiff testified about during her deposition. The first was a cash award that was provided to employees who worked on a company

audit, including ten Caucasian employees.  (Am. Compl. ¶ 55; Bellovin Decl. Ex. 1 at 65:5–66:220; 116:2-21.)   However, in her sworn declaration, Plaintiff states, "[e]veryone who had helped received a $500 award except for me and one other individual, as we were considered 'volunteers' and therefore did not receive this award."  (Bellovin Decl. Ex. 6 ¶ 31.)   Additionally, during her deposition Plaintiff stated that another African American female employee, her supervisor Shirley Kemp, was provided the bonus.  (Bellvin Decl. Ex. 1 at 65:5-14.)  It is clearly undisputed that (i) Plaintiff was not the only employee that did not receive the bonus, and (ii) another employee in both of Plaintiff's protected classes did receive the bonus.  Therefore, no reasonable jury could find an inference of racial discrimination due to Plaintiff not receiving the audit bonus.

Plaintiff also alleges that Lawless refused to grant her a cash award in 2016 due to disciplinary issues.  (Am. Compl. ¶ 59; Bellovin Decl. Ex. 1 at 71:7-14.)  However, Plaintiff fails to produce any evidence that could plausibly show an inference of racial or gender discrimination. In fact, Plaintiff testified during her deposition that she believed she was suspended and therefore did not receive the bonus because of her EEO case, not her race or gender.  (Bellovin Decl. Ex. at 71:7-25.)  Similar to the audit bonus, no reasonable jury could find an inference of discrimination due to Plaintiff not receiving this cash award.

## ii.  Accommodation Requests

Second, Plaintiff alleges "numerous requests for accommodations [were] denied."  (Opp. at 9.)   The Amended Complaint alleges that other Caucasian employees were granted the accommodation of transferring to other departments, including Wendy Konzelman and Chris Cowen.  (Am. Compl. ¶ 48.)  During her deposition, Plaintiff testified that both Konzelman and Cowen were allowed to switch supervisors after they had problems with their supervisor, Jeanette Grove, and that Mark Delarede, another Caucasian coworker, was moved to different supervisor

14

after he alleged his supervisor, Amy Gopel, was not treating him fairly.  (Bellovin Decl. Ex. 1 at 59:7–60:20; 61:17-25.)  Further, in her sworn declaration, Plaintiff again alleges Konzelman and Cowen were allowed to transfer to other shifts and supervisors, and another Caucasian employee named Victor "Doe" was permitted to work in a new department.  (Bellovin Decl. Ex. 1 at 51:17-22; Ex. 6 ¶¶ 19, 28.)

However, as discussed above, to create an inference of discrimination, the similarly situated employees must be similarly situated in all material respects.  Employment characteristics that can support the conclusion that two employees are "similarly situated" include "similarities in education, seniority, performance, and specific work duties" and "similar requirements for skill, effort and responsibility for jobs performed under similar working conditions."  *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 580 (S.D.N.Y. 2013) (internal quotation marks and citations omitted); *see also Edwards v. N.Y. State Office of Mental Health*, No. 16 Civ. 1397 (BMC), 2017 WL 666227, at *5 (E.D.N.Y. Feb. 20, 2017) (holding the plaintiff's evidence that showed a coworker outside of his protected class was hired at the same time for the same job and worked under the same working conditions barely sufficed to raise an inference of discrimination for a Title VII discrimination claim).  While this is generally a question of fact for a jury, "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  *Britt v. Merrill Lynch & Co., Inc.*, No. 08 Civ. 5356 (GBD), 2011 WL 4000992, at *6 (S.D.N.Y. Aug. 26, 2011) (citing *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007)).

Here, Plaintiff has failed to submit sufficient evidence to show that the coworkers she alleged are similarly situated were in fact similar to her in any material way.  Plaintiff has merely proffered the race, gender, and, for some, the supervisor of the listed Mint employees, which is

insufficient to raise an inference of discrimination.  *See Ware v. Donahoe,* No. 3:09cv00740 (DJS), 2014 WL 840225, at *10 (D. Conn. Mar. 4, 2014) ("Ware has provided nothing more than a statement that other similarly situated employees within the Postal Service who are not of the same color, race, gender or age were not subjected to the same levels of harassment.  This is a conclusory statement with no factual support."); *Gelin v. Geithner*, No. 06-CV-10176 (KMK), 2009 WL 804144, at *18 (S.D.N.Y. Mar. 26, 2009) (holding plaintiff failed to show similarly situated employees and therefore raise an inference of discriminatory animus where he submitted evidence showing specific employees held the same position, but failed to submit evidence to show that they were similar in terms of "the quality of their performance, their disciplinary records, or other material factors relevant to deciding whether to assign managerial responsibilities").  For example, additional, material characteristics the Court would need to evaluate Plaintiff's claims include the employees' job titles, disabilities, reasons for the transfers, and history at the Mint.

Additionally, "[i]n the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated." *Diggs v. Niagara Mohawk Power Corp.*, No. 114CV244GLSCFH, 2016 WL 1465402, at *4 (N.D.N.Y. Apr. 14, 2016); *see also Brown v. Waterbury Bd. of Educ.*, 247 F. Supp. 3d 196, 209 (D. Conn. 2017) (holding employees were not similarly situated as they were disciplined by other supervisors) (collecting cases).  Here, Plaintiff either testified that the listed employees had different supervisors, or failed to describe which supervisor each worked under.  Therefore, Plaintiff has failed to provide evidence that similarly situated individuals outside of her protected class were provided accommodations that she was denied.[2]

---

[2] Further, Plaintiff's testimony is that these employees were allowed to report to different supervisors or switch shifts, they were not transferred to different departments as alleged in the Amended Complaint.  (Bellovin

Plaintiff also proffers Campbell's deposition testimony as support for an inference of discrimination related to the denial of her FMLA leave.  During her deposition, Campbell stated that she believed Carol Helbig acted in a discriminatory manner when she denied Plaintiff's requested FLMA because of the way Helbig "was speaking and the way that she handed [Plaintiff] the paper."  (Bellovin Decl. Ex. 3 at 42:2–43:20.)  However, this testimony does not raise a genuine issue of material fact as none of the reported behavior that Campbell observed can plausibly raise an inference of discrimination based on race.  At most, the reported behavior reflects a rude or disrespectful interaction.  *See Pacheco v. Comprehensive Pharm Servs*., No. 12 Civ. 166(AJN), 2013 WL 6087382, at *10 (S.D.N.Y. Nov. 19, 2013) ("the allegations that Defendant Toda referred to Plaintiff as '[c]ocky,' spoke to Plaintiff 'in a condescending manner,' ordered Plaintiff to sit down 'as if he were expressing a command to a dog,' and was generally 'rude' bear no relation to Plaintiff's national origin and raise no inference of discrimination."); *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 192 (E.D.N.Y. 2002) ("Plaintiff's complaints, in turn, that Sjolin was rude, threatening and combative toward her evidences the hostility between them, but does not provide ground for inferring that the hostility stemmed from plaintiff's race or gender."); *Taylor v. Polygram Records*, No. 94 Civ. 7689(CSH), 1999 WL 124456, at *16 (S.D.N.Y. Mar. 8, 1999) ("Taylor's belief, based on no evidence other than gut instinct, that Grant treated her with hostility because of her *race*, cannot justifiably support an inference of discrimination when nothing in the record remotely links Grant's treatment of her to her race.") (emphasis in original). Notably, in Plaintiff's own deposition she stated that she believed her FMLA request was denied

---

Decl. Ex. 1 at 59:7–60:20; 61:17-25.)  This is precisely the solution the Mint provided to Plaintiff in 2013 once she reported an issue with her then supervisor, Debra Satkowski, and again provided to Plaintiff when she submitted a request for a transfer as a reasonable accommodation.  (56.1 ¶¶ 12; 37.)

due to retaliation after she complained about her supervisor, not because of her race. (Bellovin Decl. Ex. 1 at 48:18–49:11.)

### iii. Discipline

Third, Plaintiff alleges she received "unfair discipline that other employees were not subjected to." (Opp. at 9.) During her deposition, Plaintiff testified that other colleagues, including an employee named Steve Jones and a Spanish employee named "Myra," have disrespected Shirley Kemp, and she never disciplined them like Plaintiff. (*Id*. at 74:5-17; 75:22–76:11.) Plaintiff also testified that her suspensions were more severe than others, including Konzelman, who received a weekend suspension, and a white employee named Anna Lee who received "like two days." (*Id*. at 95:3-13.) Plaintiff fails to raise an inference of discrimination for the same reasons discussed above. Plaintiff has not proffered any evidence of material similarities between herself and the identified employees and their conduct, nor has she proffered any other evidence that raises an inference of discrimination based on gender or race.

### iv. Deposition Testimony

Lastly, Plaintiff testified about several other instances where she alleges she was treated differently based on her race or gender, including (i) the denial of her advance leave and sick leave requests; (ii) the security alert; (iii) multiple AWOLs; and (iv) she was not granted an interview for a position that she qualified for. (Bellovin Decl. Ex. 1 at 50:23–51:16; 73:3-12; 77:16–78:21; 90:13-25; 93:20–94:16.) For some of these allegations, Plaintiff testified that other Mint employees were treated more favorably, including (i) Victor "Doe" was "not labeled a security risk" when he returned from medical leave; (ii) three Caucasian employees were granted advance leave; (iii) two Caucasian males and one Spanish male were provided the position she applied for;

and (iv) a Caucasian employee received a bonus when he came up with an idea to save the company money.  (*Id*. at 74:14–75:18; 77:16–78:21; Ex. 6 ¶¶ 19, 37.)

However, as Plaintiff has failed to provide any evidence of material similarities between herself and these other employees, this testimony alone, with no additional evidence or any allegations regarding specific comments or actions made due to Plaintiff's race or gender, are not sufficient for an inference of discrimination.  *See Ralkin v. New York City Transit Auth*., 62 F. Supp. 2d 989, 999–1000 (E.D.N.Y. 1999) (holding the plaintiff failed to show an inference of discrimination where she failed to provide evidence that another employee was similarly situated besides her "conclusory and unsubstantiated statements in her deposition testimony").

Therefore, Plaintiff has failed to establish a *prima facie* case of racial or gender discrimination, and Defendants are granted summary judgment as to Plaintiff's Title VII discrimination claim.

### b.  Retaliation

Plaintiff also brings a claim for retaliation under Title VII, as she alleges Defendants retaliated against her by terminating her employment after she filed an EEOC complaint against her supervisor.  (Opp. at 15-16.)  Like Title VII discrimination claims, Title VII retaliation claims "are evaluated using a three-step burden shifting analysis."  *Fincher v. Depository Tr. & Clearing Corp*., 604 F.3d 712, 720 (2d Cir. 2010).

First, to establish a *prima facie* case of retaliation, a Plaintiff must provide sufficient evidence from which a reasonable trier of fact could find:

> (1) that []he engaged in protected activity under the anti-discrimination statutes, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Gachette v. Metro N.-High Bridge*, 722 F. App'x 17, (2d Cir. 2018) (citing *Fincher*, 604 F.3d at 720). An action is sufficiently adverse to sustain a claim of retaliation where it is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010) (internal quotation marks omitted).

If a plaintiff satisfies this initial burden, "a presumption of retaliation arises." *Id.* at 164 (internal citation omitted). The burden then shifts to the defendant, who must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (internal citation omitted). If the defendant provides such an explanation, "the presumption of retaliation dissipates," *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005), and the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Defendants aver that assuming, *arguendo*, Plaintiff can establish a *prima facie* case, she fails to establish that their legitimate, non-discriminatory reason for her termination was pretext. (Mem. at 16.) Specifically, that Defendants terminated Plaintiff due to a "culmination of a progressive disciplinary process" that included multiple instances of Plaintiff refusing to follow supervisory instructions. (*Id.*) In response, Plaintiff argues she was terminated for sitting at the wrong desk, and termination was an extreme punishment for this behavior. (Opp. at 15-16.) Plaintiff also states her termination came only ten days after she filed an EEOC complaint, which establishes causation and pretext. (*Id.* at 16.)

At the pretext stage, a plaintiff "may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment[.]" *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d

396, 403 (S.D.N.Y. 2014) (quoting *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 847 (2d Cir. 2013)).

The pretext stage "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846.  A plaintiff can meet this burden by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-retaliatory reasons for its action."  *Id.*

Here, Plaintiff first alleges that Defendants' reason for her termination was plainly inappropriate.  (Opp. at 15.)  The Notice of Proposed Removal filed by Bennett includes one charge for failure to comply with supervisory instructions, and two specifications involving instances where Plaintiff worked outside of her assigned area after being told that this was not permitted. (Bennett Decl. Ex. A.)  While Plaintiff clearly disagrees with the Defendants' decision, she presents no evidence that could plausibly lead a reasonable jury to conclude Plaintiff's insubordination was in fact not the only reason she was terminated.  Plaintiff proffers the testimony of DiNardi and Bennett to show that no other employee has ever been terminated for a similar reason.  (Opp. at 15-16.)  While DiNardi testified that he did not recall any other employee that was terminated for failing to sit in the correct seat, he did testify that there have been employees terminated for failure to follow supervisory instructions.  (Bellovin Decl. Ex. 4 at 37:24–38:6.) Further, the testimony of only two Mint employees does not confirm that this is in fact true.

Second, Plaintiff alleges that pretext can be shown by temporal proximity, and Plaintiff was terminated a "mere few weeks" after filing an EEOC complaint.  (Opp. at 16.)  However, it is settled that "mere temporal proximity," though sufficient to establish a *prima facie* case of retaliation, is legally insufficient to avoid summary judgment at the pretext stage of the analysis. *Galimore v. City Univ. of N.Y. Bronx Cmty. Coll.*, 641 F. Supp. 2d 269, 289 (S.D.N.Y. 2009).

Accordingly, Plaintiff has failed to establish Defendants' legitimate, non-discriminatory reason for her termination was pretext, and Defendants are granted summary judgment for her Title VII retaliation claim.[3] [4]

## II.   Rehabilitation Act[5]

Federal employees must bring claims for disability discrimination under the Rehabilitation Act.   29 U.S.C. § 791; *see Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998) (holding the plaintiff's "sole claim for discrimination on the basis of disability is under the Rehabilitation Act, if anywhere.").   Claims brought under the Rehabilitation Act may be based "on any of 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.'"   *Cheung v. Donahoe*, No. 11-cv-0122 (ENV) (RLM), 2016 WL 3640683, at *5 (E.D.N.Y. June 29, 2016) (quoting *Lupe v. Shinseki*, No. 1:10-CV-198 (MAD/ATB), 2012 WL 3685954, at *7 (N.D.N.Y. Aug. 24, 2012)).   Here, Plaintiff

---

[3] Any allegations involving Plaintiff's disability will be evaluated under her disability discrimination claim only as "disability is not a characteristic protected by Title VII."  *Lee v. Colvin*, No. 15 Civ. 1472 (KPF), 2017 WL 486944, at *9 (S.D.N.Y. Feb. 6, 2017).

[4] Plaintiff also made various allegations of retaliation during her deposition and in her 56.1 that are not addressed in her opposition to the instant motion.  Specifically, Plaintiff alleges she was (i) marked AWOL; (ii) suspended; (iii) denied attendance at the retirement class; (iv) denied the audit bonus; (v) given more work; (vi) denied a bonus; (vii) denied sick and advance leave; and (viii) denied a transfer to another department, all in retaliation for her EEO complaints.  (56.1 ¶¶ 17-18; 52-55; Bellovin Decl. at 53:21–54:3; 55:11-14; 57:2-15; 63:13-20; 66:16-18; 66:21–67:5; 71:20-22; 72:14-16; 73:16-17; 75:6-9; 75:22-25; 77:16–78:4; 110:18-25.)  This testimony alone is insufficient at the summary judgment stage.  *See, e.g., Taylor v. Dollar Tree Stores*, No. 18-CV-1306-SJB, 2020 WL 2478663, at *11 (E.D.N.Y. May 13, 2020) (holding the plaintiff's own deposition testimony was insufficient to survive summary judgment for their Title VII discrimination claim); *Jamel v. Napolitano*, 909 F. Supp. 2d 196, 211 (W.D.N.Y. 2012) (granting summary judgment in a Title VII action after holding "no admissible evidence beyond the allegations in the pleadings and plaintiff's self-serving deposition testimony that could be considered sufficient to raise the reasonable inference" of termination based on religion and national origin).

[5] While Plaintiff's Amended Complaint includes disability discrimination claims under the ADA, Defendants aver that Plaintiff's remedy for alleged disability discrimination falls under the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, as federal employees have "no remedy for employment discrimination under the ADA."  *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998).  Plaintiff does not dispute this, and addresses Defendants' arguments against a Rehabilitation Act claim in her opposition.  Additionally, "[t]he same standard applies to disability discrimination claims under the Rehabilitation Act as under the ADA."  *Smith v. New York City Dep't of Educ.*, No. 18 Civ. 8545 (PGG), 2019 WL 6307471, at *6 (S.D.N.Y. Nov. 25, 2019).  Therefore, the Court will address Plaintiff's disability discrimination claims under the Rehabilitation Act.

alleges violations of the Rehabilitation Act based on both Defendants' failure to grant her reasonable accommodations, and disparate treatment based on Defendants' treatment of similarly situated employees.  (Opp. at 18-19.)

### a. Reasonable Accommodation

To establish a *prima facie* case of failure to accommodate a disability, a plaintiff must demonstrate that "(1) the plaintiff is a person with a disability under the meaning of the statute in question; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *Costabile v. New York City Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020).  The burden then shifts to the defendant to demonstrate that the accommodation "would impose an undue hardship."  *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir. 1995).

Here, Defendants argue that Plaintiff cannot establish a *prima facie* case as she cannot establish that her accommodation requests were reasonable.  (Mem. at 18-20.)  Generally, reasonable accommodations include "modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, reassignment to a vacant position."  *Manns v. United Airlines*, No. 13-CV-3668 (CBA) (LB), 2016 WL 6826761, at *8 (E.D.N.Y. Nov. 15, 2016).  The employee "bears the burdens of both production and persuasion as to the existence of some accommodation . . . including the existence of a vacant position for which she is qualified."  *Id.* (citing *McBride v. BIC Consumer Prods. Mfg. Co.*, 583, F.3d 92, 97 (2d Cir. 2009)).

Plaintiff alleges she made "numerous" requests for accommodations for her stress and anxiety disorder.  (Opp. at 18.)  This appears to include (i) requests to change departments; (ii)

sick leave; (iii) FMLA leave; and (iv) requests to change her assigned seating area.  The Court will examine each in turn.

        *i.   Requests for Transfers*

The undisputed record reflects six instances where Plaintiff requested to be transferred to a different department:  (i) on December 17, 2014, March 15, 2015, August 28, 2015, and March 9, 2016, Plaintiff made requests for a detail or transfer from her department; (ii) on January 6, 2015, Plaintiff submitted a doctor's note to Lawless that states "Patient tells of often being sad in her current position and would benefit if she was detailed/transferred to another department"; and (iii) on July 15, 2016, Plaintiff submitted a reasonable accommodations request form requesting she be removed from her department due to stress and anxiety.

As an initial matter, it is not clear to the Court that the December 17, 2014, March 15, 2015, August 28, 2015, and March 9, 2016 requests were actually requests for an accommodation based on disability, as Plaintiff generally made these requests based on reported disagreements with her supervisors.  Specifically, in an email sent by Plaintiff on December 17, 2014 she states she was requesting a detail to another department due to a meeting held the day before where Lawless asked Plaintiff about supposed remarks she had made to Satkowski.  (DiNardi Decl. Ex. A.) Similarly, Plaintiff sent an email on March 16, 2015 asking to be removed from her department as she was "tired of dealing with supervisors who don't value the employees or certain employees." (Lawless Decl. Ex. M.)  The August 28, 2015 request was sent to an EEO Complaints Manager, who did not mention Plaintiff's alleged disability when she forwarded the request to Lawless and Kemp.  (*Id*. Ex. N.)  Lastly, the March 9, 2016 request stated that Plaintiff did not want "any confrontation with anyone" and she just wanted to "come to work in peace and leave in peace." Not one of these emails discusses Plaintiff's stress and anxiety disorder.

24

Further, Plaintiff has provided no evidence that a potential accommodation actually existed when she made her requests.  Specifically, Plaintiff has not satisfied her burden as she has failed to "demonstrate the existence, at or around the time when accommodation was sought, of an existing vacant position to which she could have been reassigned." *McBride*, 583, F.3d at 97–98; *see also Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999) ("[A]n employer need not reassign an employee if no position is vacant . . . Nor is the employer obliged to create a new position to accommodate the employee.").  Plaintiff has failed to offer any evidence of a vacant position in a different department that she was qualified to work in that she could have been transferred to.

Plaintiff has also failed to show, specifically in regard to her only formal request, that Defendants refused her an accommodation.  Once Plaintiff submitted the reasonable accommodation form, Lawless informed Plaintiff that the medical documentation she provided was insufficient, and that she could work with the EEO Specialist to determine what information was necessary.  (Lawless Decl. Ex. S.)  The record does not reflect that Plaintiff submitted any additional documentation at this time or spoke to Lawless or the EEO Specialist about her request[6], and "[a]n employee who is responsible for the breakdown of [the] interactive process may not recover for a failure to accommodate." *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 794 (S.D.N.Y. 2020) (quoting *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 945–46 (2d Cir. 2008)); *see also Khalil v. Pratt Inst.*, No. 16-CV-06731 (JFB)(SIL), 2019 WL 1052195, at *7 (E.D.N.Y. Feb. 13, 2019) ("A defendant is not liable for failure to provide a reasonable accommodation . . . if the plaintiff does not ask for an accommodation, or fails to provide

---

[6] Instead, the record shows that Plaintiff responded to Lawless' proposed options "outside of the reasonable accommodation process" only.  (Lawless Decl. Ex. S.)

information necessary to assess the request for an accommodation.") (internal citation omitted). Therefore, Plaintiff cannot show that Defendants refused her a reasonable accommodation.

### ii. Sick Leave

Plaintiff also made multiple requests for sick leave during her time at the Mint. To the extent that Plaintiff is arguing that the denial of sick leave consisted of the refusal to grant reasonable accommodations, this claim also fails. Plaintiff fails to show that her requested leave is a reasonable accommodation under the statute. The undisputed record reflects five days where Defendants marked Plaintiff as AWOL after her sick leave was denied, including on July 17, 2014, July 18, 2014, August 10, 2016, August 11, 2016, and November 4, 2016.[7] While there are disputes regarding the reasons why Plaintiff requested this leave, why the requests were denied, and whether Plaintiff properly requested leave pursuant to Mint policies, Plaintiff has still failed to raise a material issue of fact. A reasonable accommodation under the Rehabilitation Act must "allow a plaintiff to perform the essential functions of his or her job." *Kaufman v. City of N.Y.*, No. 98CIV.2648(MJL)(KNF), 1999 WL 239698, at *2 (S.D.N.Y. Apr. 22, 1999). Plaintiff has failed to allege how taking sick leave would have enabled her to perform the essential functions of her job once she returned. *Manns*, 2016 WL 6826761, at *9 ("The Second Circuit has held that a leave of absence for a finite period may be a reasonable accommodation if an employee shows that leave will enable him to perform the essential functions of the job when he return[s] to work.") (citing *Graves v. Finch Pruyn & Co., Inc.*, 353 F. App'x 558, 560–61 (2d Cir. 2009)).

### iii. FMLA Leave

Plaintiff appears to also be alleging the initial response to her FMLA leave request was the denial of a reasonable accommodation. However, the undisputed record reflects that the Mint

---

[7] Plaintiff also alleges she was denied leave to go to her sister's funeral. (Opp. at 18.) As this leave was not related to Plaintiff's disability, it cannot form the basis of a disability discrimination claim.

responded to Plaintiff's request, at first requesting additional information, and then once Plaintiff provided this information, granting the request the same day.  (56.1 ¶¶ 26-27.)  Plaintiff has provided no evidence showing the Mint's first response constitutes a denial of a reasonable accommodation.

###### iv. *Requests to Change Seating*

Plaintiff appears to have made four requests regarding her seating area at the Mint.  First, Plaintiff states in her sworn declaration that in 2014 she requested "a reasonable accommodation . . . to sit in a different area of the office" and that this request was denied.  (Bellovin Decl. Ex. 6 ¶¶ 20-22.)  Plaintiff also testified during her deposition that in 2015 or 2016 she "filled out paperwork" and gave it to Lawless that requested she be moved to another room, and also asked DiNardi to move her desk.  (*Id*. Ex. A at 31:2-20; 57:18–58-2; 59:2-6.)  However, Plaintiff has failed to satisfy her burden as she has offered no evidence that shows she made a sufficient request for an accommodation.  *See Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 657 (6th Cir. 2016) (denying disability discrimination claim where the plaintiff only offered a sworn declaration stating he requested human resources review his medical records and a meeting to discuss his options).  Here, Plaintiff does not sufficiently allege what these specific requests entailed or how they would accommodate her disability.

Second, the Amended Complaint alleges that, in 2019, Bennett denied Plaintiff an accommodation that would allow her to sit in a separate area to avoid Kemp.  (Am. Compl. ¶¶ 72-73.)  However, in her sworn declaration, Plaintiff alleges this move was to avoid another employee, Tracy Henry.  (Bellovin Decl. ¶ 38.)  Regardless of which employee was causing Plaintiff stress and anxiety, she has failed to offer sufficient evidence showing that this move was a reasonable accommodation.  In fact, in the Amended Complaint she states that after she was asked to return

to her assigned seat, she provided her union representative with medical documentation to assist her in filing a request for an accommodation.  (Am. Compl. ¶ 76.)  As Plaintiff was shortly after terminated, she cannot show that she made a request for an accommodation that was denied by Defendants.

Therefore, no reasonable jury could find that Plaintiff was ever denied a reasonable accommodation.

### b.  Disparate Treatment

Disparate treatment claims under the Rehabilitation Act are analyzed pursuant to the *McDonnell Douglas* burden-shifting framework.  *Kleyman v. SUNY Downstate Med. Ctr*., No. 18-CV-3137 (PKC) (ST), 2020 WL 5645218, at *14 (E.D.N.Y. Sept. 21, 2020).  To establish a *prima facie* case of disability discrimination, the plaintiff must show "(1) plaintiff's employer is subject to the Rehabilitation Act; (2) plaintiff was disabled within the meaning of the Rehabilitation Act; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of her disability."  *Quadir v. New York State Dep't of Labor*, No. 13-CV-3327 JPO, 2016 WL 3633406, at *5 (S.D.N.Y. June 29, 2016).

Defendants aver that Plaintiff's claim fails as she cannot demonstrate other similarly situated employees were treated differently than her.  (Mem. at 20-21.)  In response, Plaintiff again points to two coworkers, Konzelman and Cowen, as examples of others who were granted transfers to different supervisors.  (Opp. at 19.)  For the same reasons Plaintiff's Title VII discrimination claim fails, so too does this one.  As discussed above, Plaintiff fails to show that Konzelman and Cowen are similarly situated employees.  *See De Figueroa v. N.Y. State,* 403 F. Supp. 3d 133, 160 (E.D.N.Y. 2019) (dismissing Rehabilitation Act claim where the plaintiff failed to allege the

defendants gave more favorable treatment to similarly situated employees who were not disabled). Plaintiff fails to describe any of Konzelman or Cowen's characteristics, besides their race and their supervisors, which are notably different than Plaintiff's.

Plaintiff also alleges that she was given "more and harder assignments despite her disability which caused extra stress and anxiety." (Opp. at 19.) This appears to be a reference to the allegation that on July 17, 2014, Kemp assigned Plaintiff to work alone on a project that required more than one person. (Am. Compl. ¶ 40.) However, when asked about this incident during her deposition, Plaintiff testified she believed this project was assigned to her in retaliation for her EEO case and complaints about Kemp, not because of her disability. (Bellovin Decl. Ex. 1 at 109:2–110:25.) She therefore fails to make a *prima facie* showing, as she cannot show she suffered an adverse employment action because of her disability.

Accordingly, Defendants are granted summary judgment on Plaintiff's Rehabilitation Act claims.

### III.    ADEA

Plaintiff next alleges that Defendants violated the ADEA by treating her, an employee over 40, differently than other, younger employees. (Opp. at 21.) Under the ADEA, it is "unlawful for an employer to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (citing 29 U.S.C. § 623(a)(1)). The *McDonnell Douglas* framework is used to analyze these claims. *Id.* The plaintiff must first bear the burden of establishing a *prima facie* case of age discrimination by showing that: "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse

employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone 'substantially younger.'" *Id*. (citing *O'Connor v. Consol. Coin Caterers Corp*., 517 U.S. 308, 313 (1996)).

Defendants allege that Plaintiff fails to establish a *prima facie* case as she has failed to present any evidence of an inference of discrimination based on her age.  (Mem. at 22-23.)  In her opposition, Plaintiff alleges that she "was treated differently and less favorably than other younger, comparator employees." (Opp. at 21.)  Further, in her declaration, she states "younger" employees, including Konzelman and Cowen, were allowed transfers to other shifts and supervisors when she was not, and three employees under the age of 40 were granted a position she applied for.  (Bellovin Decl. Ex. 6 ¶¶ 28; 37.)  However, similar to the above, Plaintiff has failed to proffer a similarly situated employee not in her protected class that was treated favorably by Defendants.  She therefore has failed to raise an inference of discrimination based on age, and no reasonable juror would find that she has shown a *prima facie* case.

Accordingly, Defendants are granted summary judgment on Plaintiff's ADEA claim.

## IV.    Hostile Work Environment

Plaintiff brings a hostile work environment claim due to "severe hostile conduct" she experienced over six years, including hostility and unfairness from supervisors and human resources personnel.  (Opp. at 23.)  The standard for demonstrating a hostile work environment is the same under Title VII, the ADEA, and the Rehabilitation Act.  *Leftridge v. N.Y.C. Dep't of Educ.*, No. 17cv7027, 2020 WL 1503665, at *11 (S.D.N.Y. Mar. 30, 2020) (collecting cases); *Murtha v. N.Y.S. Gaming Commission*, No. 17 Civ. 10040 (NSR), 2019 WL 4450687, at *7 (S.D.N.Y. Sept. 17, 2019) (explaining that the standard for hostile work environment is the same under Title VII and the ADEA).

"A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). The plaintiff must show "the terms and conditions of her employment" were altered because of "discriminatory intimidation, ridicule, and insult." *Id.* Courts may consider "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). For instance, "incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano*, 294 F.3d at 374 (quoting *Perry*, 115 F.3d at 149). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.*

Here, Defendants argue that Plaintiff cannot show severe or pervasive conduct, or evidence that any of the alleged conduct occurred because of her characteristics. (Mem. at 24-25.) In response, Plaintiff alleges she faced "specific instances of feeling threatened by supervisors and even Human Resources personnel," including (i) Satkowski and Kemp treating her "unfairly"; (ii) Kemp giving Plaintiff extra work and marking her as AWOL; and (iii) Human Resources Specialist Jim Kelly becoming "extremely aggressive" with her. (Opp. at 23.) Specifically, Plaintiff has proffered testimony from both her and Campbell showing: (i) one incident where Kemp told her to work alone during first shift, which was too much work for one person, (Bellovin Decl. Ex. 1 at 109:9-22); (ii) one incident where Helbig was "snippy" with Plaintiff, (*id.* Ex. 3 at 42:7-43:13); and (iii) one incident where Kelly pointed his finger in Plaintiff's face and yelled at

her, (*id.* at 47:15-25).  The Court holds that these allegations are insufficient as a matter of law to consist of a hostile work environment.

Considering the totality of the circumstances, the Court holds that no reasonable jury could find that these incidents rise to the level of a hostile work environment.  First, Plaintiff's allegations fail to show a pervasive work environment.  Plaintiff has generally alleged isolated and sporadic incidents that occurred over the course of six years.  Courts in this circuit have required more regularity than what Plaintiff has alleged.  *See, e.g.*, *Martin v. City Univ. of N.Y.*, No. 17 Civ. 6791 (KPF), 2018 WL 6510805, at *89, *12 (S.D.N.Y. Dec. 11, 2018) (dismissing hostile work environment claim where the plaintiff experienced four comments about his race and age during approximately one year of his employment).  Therefore, the frequency of Defendants' alleged conduct over the course of six years is insufficient to establish the pervasive pattern of discrimination necessary to constitute a hostile work environment claim.

Second, Plaintiff's allegations fail to show a severe work environment.  While Plaintiff has shown incidents where she believed her supervisors were being "unfair," "excessive criticism and rudeness do not constitute a hostile work environment."  *Ramirez v. Temin & Co.*, No. 20 Civ. 6258 (ER), 2021 WL 4392303, at *8 (S.D.N.Y. Sept. 24, 2021).  Further, Plaintiff has not proffered a single incident that involved her race, age, or disability.  *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.").

Accordingly, Defendants are granted summary judgment on Plaintiff's hostile work environment claims.

## V.      NYSHRL

Plaintiff also brings claims for discrimination and retaliation under the NYSHRL. Defendants allege this Court lacks subject matter jurisdiction over Plaintiff's NYSHRL claim. (Mem. at 25.)  Plaintiff does not address this claim in her opposition.  The Court agrees with Defendants, as Plaintiff's claims may only be brought under the federal statutes. *Wilder v. Shulkin*, No. 14-CV-10072 (RJS), 2017 WL 2889507, at *4 (S.D.N.Y. June 30, 2017) ("Title VII is 'the exclusive remed[y] available to federal employees who allege employment discrimination' on the basis of gender, color, or race.") (internal citation omitted); *McManamon v. Shinseki*, No. 11 Civ. 7610(PAE), 2013 WL 3466863, at *2 (S.D.N.Y. July 10, 2013) (stating the plaintiff's "NYSHRL[] and NYCHRL claims [were dismissed] because those statutes do not provide relief for a federal employee's [disability discrimination] claim against a federal agency"); *Chmiel v. Potter*, No. 09-CV-555(RJA), 2010 WL 5904384, at *5 (W.D.N.Y. Dec. 7, 2010) ("[T]he Rehabilitation Act provides the exclusive remedy for federal employees alleging discrimination on the basis of disability.").

Accordingly, summary judgment is granted as to Plaintiff's NYSHRL claim.

## VI.      Wrongful Termination

Lastly, Plaintiff brings a common law clam for wrongful termination "based upon Plaintiff's age, race, gender and disability."  (Am. Compl. ¶ 137.)  Defendants argue this claim should be dismissed for the same reasons as Plaintiff's Title VII, Rehabilitation Act, and ADEA claims.  (Mem. at 23.)  Plaintiff fails to address this claim in her opposition, and therefore it is unclear what exactly Plaintiff is alleging as "New York law does not recognize a claim for wrongful termination." *Metzler v. Harris Corp.*, No. 00 CIV 5847 HB, 2001 WL 194911, at *2

(S.D.N.Y. Feb. 26, 2001).  Therefore, the Court finds that Plaintiff's wrongful termination claim fails for the same reasons as her federal law claims.

Accordingly, summary judgment is granted as to Plaintiff's wrongful termination claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.  The Court respectfully directs the Clerk of Court to terminate the motion at ECF No. 87 and to terminate the action.

Dated: January 3, 2022
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge

34